IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Robert Livingston, Jr.; Barbara Livingston; Robert Livingston, Jr., as Personal Representative of the Estate of Robert Livingston, Sr.; Robert Livingston, Jr., as Personal Representative of the Estate of Raye H. Livingston; Lucious Albert Strickland, Jr.; Wade H. Sellers; Robert E. Sellers; and Old Wire Road Paradise, LLC; <br><br> Plaintiffs, <br><br>vs. <br><br> Copart of Connecticut, Inc., <br><br> Defendant. | Civil Action No: 3:21-3289-TLW <br><br><br> **COMPLAINT** <br> **(Jury Trial Demanded)** |

1.      This is a civil suit brought under the citizen suit enforcement provision of what is commonly known as the Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq*., specifically, under 33 U.S.C. § 1365, and claims against Defendant Copart of Connecticut, Inc. ("Copart") for, *inter alia*, negligence, nuisance, and trespass.

2.      This case is filed as a companion to case number 3:17-cv-02543-TLW, currently pending before this Court.

**JURISDICTION AND VENUE**

3.      Plaintiffs bring this civil suit under the citizen-suit enforcement provisions of Section 505 of the CWA, 33 U.S.C. § 1365.

4.      This Court has subject matter jurisdiction over the parties and this action pursuant to those statutes and 28 U.S.C. § 1331 (providing district courts with original jurisdiction over an action arising under the Constitution and laws of the United States).

5.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state claims pled because they are related to the federal claims and form part of the same case or controversy under Article III, United States Constitution.

6.      Alternatively, jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy is claimed to be in excess of $75,000, exclusive of interest and costs.

7.      Venue is proper in the U.S. District Court for the District of South Carolina, Columbia Division, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and Local Civil Rule 3.01(A)(1) because the source of the violations—Copart's facilities in Lexington County, South Carolina—are located within this judicial district and division.

8.      On August 6, 2021, Plaintiffs completed notification to Copart and other required parties of Plaintiffs' intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements set forth in 33 U.S.C. § 1365(a)(1), and the corresponding regulations at 40 C.F.R. § 135.2.

9.      The New Notice Letter was filed in case number 3:17-cv-02543-TLW on July 22, 2021, at ECF No. 173-1. A true and accurate copy of Plaintiffs' notice letter is appended hereto at **Exhibit A** ("New Notice Letter").

10.     More than 60 days have elapsed since Plaintiffs completed the required notifications to Copart and other parties about Copart's violations through the New Notice Letter pursuant to the CWA, during which time neither the United States Environmental Protection Agency ("EPA") nor the South Carolina Department of Health and Environmental Control ("DHEC") have commenced and diligently prosecuted an action to redress the CWA violations alleged in this complaint. 33 U.S.C. § 1365(b)(1)(B).

11.     The violations identified in the New Notice Letter are continuing at this time and are likely to continue in the future for the same reasons set forth in the New Notice Letter.

12.     All conditions precedent to the CWA claims asserted in this case have occurred or been performed.

## PARTIES

13.     Plaintiffs Major General Robert Livingston, Jr. and Barbara Livingston, are citizens and residents of Lexington County, South Carolina.

14.     Plaintiff Major General Robert Livingston, Jr., as Personal Representative of the Estate of Robert Livingston, Sr., is a citizen and resident of Lexington County, South Carolina.

15.     Plaintiff Major General Robert Livingston, Jr., as Personal Representative of the Estate of Raye H. Livingston, is a citizen and resident of Lexington County, South Carolina.

16.     Plaintiff, Lucious Albert Strickland, Jr., is a citizen and resident of Lexington County, South Carolina.

17.     Plaintiff, Wade H. Sellers, is a citizen and resident of Lexington County, South Carolina.

18.     Plaintiff, Robert E. Sellers, is a citizen and resident of Lexington County, South Carolina.

19.     Plaintiff, Old Wire Road Paradise, LLC, is a limited liability company organized and existing under the laws of the state of South Carolina.

20.     Copart is a corporation organized under the laws of the State of Connecticut with its principal place of business (the company's "nerve center") in Dallas, Texas.

## STATUTORY AND REGULATORY BACKGROUND
### Clean Water Act, 33 USC § 1251 *et seq*. (the CWA)

21.     Congress enacted the Clean Water Act (CWA) to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set as a national goal that "the discharge of pollutants into the navigable waters be eliminated. . . ." *Id.* Accordingly, Section 301(a) of the CWA provides that the discharge of pollutants into navigable waters of the United States is illegal, unless the discharger complies with the Act's requirements. Id. at § 1311(a).

22.     The EPA administers the CWA within the context of cooperative federalism. While always retaining its oversight role, the Agency can delegate administration of parts of or all of the statute to states. The CWA, though, requires a delegated State program to be at least as stringent as the Federal program. 33 U.S.C. §1342. The EPA Administrator has authorized DHEC to administer aspects of the CWA. The South Carolina Pollution Control Act [PCA], SC Code Ann. 48-1-10 et seq. empowers DHEC to "take all action necessary or appropriate to secure to this [s]tate the benefits of the Federal [CWA]." S.C. Code Ann. § 48–1–50(17).

23.     Section 301(a) of the CWA, prohibits the discharge of pollutants from a "point source" into navigable waters of the United States, unless in compliance with various enumerated sections of the law. 33 U.S.C. § 1311(a). Pursuant to the CWA, one defined as a "point source polluter" may only discharge pollutants pursuant to a National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA, or by a state or Tribe that has received approval to issue such a permit pursuant to Section 402(b) of the Act. See id. §§ 1311(a), 1342(a)-(b), 1362(12)(A).

24.     In South Carolina, South Carolina Code of Regulations, Rule 61-9, authorizes DHEC to "implement the [NPDES] program under sections 318, 402, and 405 of the [CWA]." SC Code of Regulations, R. 61-9, § 122.1(a)(1). The CWA, the South Carolina PCA, and the United States and South Carolina's regulatory implementation of the same, prohibit discharges not

authorized by, or in violation of the terms of a NPDES permit, issued pursuant to 33 U.S.C. §

1342. More specifically, 33 U.S.C. § 1342(p), as implemented, mandates NPDES permitting for

storm water discharges "associated with [certain] industrial activit[ies]," either under a

promulgated "general permit" or permit with individual coverage for the specific industrial activity

participant.

25.     40 C.F.R. § 122.26(b)(14) et seq. (and substantially identical DHEC regulations

found within S.C. Code of Regulations R. 61-9 § 122.26(b)(14) et seq.) defines storm water

discharges associated with industrial activity to nonexclusively include facilities where the

following industrial activities take place, inter alia, hazardous waste storage, landfills or open

dumps, salvage yards, automobile junkyards, and broadly defined "transportation facilities" that

have vehicle maintenance or equipment cleaning areas.

26.     A NPDES permit authorizes the discharge of only those pollutants contained in a

wastestream disclosed in a permit application or specific pollutants disclosed in a permit

application, and where the permitting agency has not expressly prohibited the wastestreams or

pollutants. 33 U.S.C. 1342(k). Depending on the nature of the industrial activity permitted, NPDES

discharge permits for industrial activities contain thorough and particularized pollutant sampling

and monitoring requirements and can contain limits on the amount or concentration of allowable

pollutants, in addition to requirements regarding control measures, best management practices, and

recordkeeping and reporting.

27.     Each separate violation of the CWA subjects the violator to a sliding daily penalty

that can be up to $52,414 per day for violations that occurred after November 2, 2015. *See* 33

U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

28.     In addition to permitting requirements for industrial activities, the CWA separately

provides for permitting for stormwater runoff from certain land disturbance activities (e.g. clearing or excavation). In South Carolina, the implementing statute and regulations fall under the South Carolina Stormwater Management and Sediment Reduction Act. SC Code § 48-14-10 *et seq*., SC Code of Regulations, 72-300 *et seq*.

29.     South Carolina issues an NPDES general permit for construction activities ("Permit"), and persons seeking to make a discharge may obtain coverage by filing a notice of intent.

## FACTUAL BACKGROUND

**Copart Operations Area #1**

30.     Copart is a subsidiary of a multi-national, publicly traded company, Copart, Inc., (NASDAQ: CPRT), which has over 160 facilities in at least eight countries and sales in excess of $4.5 billion, and whose principal business is storing, auctioning, and selling wrecked and salvaged automobiles.

31.     In Lexington County, South Carolina, north of the town Gaston, South Carolina, near the intersection of Highway 321 and Busbee Road and to the west of Highway 321, Copart owns nearly 217 acres in Lexington County, South Carolina (referred to herein as "Copart Operations Area 1").

32.     Copart operates a machine salvage junkyard and vehicle wash facilities at Copart Operations Area 1, and substantially all of the stored vehicles are in a wrecked or salvaged condition and leaking gasoline, oil, hydraulic fluids, antifreeze, and other hazardous fluids and materials into the soil.

33.     Copart stores this machinery on vast open-air tracts of cleared, bare land devoid of vegetation and largely devoid of stone and gravel cover.

6

34.     An individual machine can potentially stay for days, or months, while awaiting sale at regularly scheduled auctions conducted through Copart's website. Because of their condition and Copart's disruptive operations, the machines, primarily automobiles, but many other types of motor vehicles and industrial tools, leak harmful chemicals into the earth.

35.     Upon information and belief, Copart has been operating a motor vehicle and machine salvage junkyard business on at least a portion of this property since at least 1998.

36.     By December 2005, satellite imagery reflects that Copart cleared all trees and other large vegetation on an adjoining parcel of land—approximately 72.97 acres.

37.     By October 2006, satellite imagery reflects thousands of vehicles were stored on this plot of land.

38.     By February 2013, satellite imagery reflects that Copart had almost completely clear-cut an additional approximately 30 acres of land on an adjoining parcel.

39.     By October 2013, this 30-acre area was almost completely full of salvaged/wrecked machinery.

40.     Approximately 88 acres of generally wooded area on this parcel remain uncleared.

**Toms Branch[1] and Plaintiffs' Properties**

41.     Plaintiffs own properties that are generally located to the east and north-east of Copart Operations Area 1.

42.     A stream called Toms Branch originates on or directly east of Copart Operations Area 1 and is a tributary of the Congaree River, and the Toms Branch watershed begins directly east of Copart Operations Area 1, at the northeast corner of Highway 321 and an access road to

---

[1] Toms Branch is sometimes referred to as Tom's Creek, but both names refer to the same body of water.

the Big Country Mobile Home park.

43.     The outfall of stormwater discharges from the Copart Operations Area 1 discharges into this wetland area.

44.     Near the beginning point, to the north, several continuous flowing natural springs are found that are the beginning of Toms Branch.

45.     From this point, Toms Branch flows by Copart and through four ponds, totaling approximately five miles of stream, and eventually empties into the Congaree River, a significant water artery supporting extensive wildlife habitats, along with hunting, fishing, and recreational destinations.

46.     The Congaree River flows into numerous lakes and rivers containing wildlife refuges, vast wetlands supporting extensive waterfowl populations, and eventually empties into the Charleston harbor.

47.     The Congaree National Park, South Carolina's only national park, and the largest intact expanse of old growth bottomland hardwood forest remaining in the southeastern United States, is only one of many such ecosystems located just a few miles downstream from Toms Branch.

48.     Toms Branch also exhibits many unique characteristics in its purity and hydrology, featuring some of the cleanest natural waters in South Carolina, previously characterized as "drinking quality water" by South Carolina authorities. Toms Branch is fed by as many as 100 freshwater springs, and as such, it is not an intermittent stream resulting from rainwater runoff; it is a continuously flowing spring-fed stream considered a water of the State, as well as a protected wetland.

49.     Toms Branch is classified as a perennial Relatively Permanent Stream (pRPW)

stream by the United States Army Corps of Engineers.

50.     Toms Branch runs through Plaintiff Lucious Albert Strickland, Jr.'s property as a free-flowing stream.

51.     The Toms Branch stream system also feeds wetlands on Plaintiff Strickland's properties.

52.     Toms Branch then runs through the properties of the remaining Plaintiffs in part as a free-flowing stream and in part as an impounded stream forming pounds on their properties.

53.     All of the individual Plaintiffs derive personal enjoyment from their property and the area surrounding Toms Branch.

54.     Historically, the individual Plaintiffs have utilized their own property and the property of the other Plaintiffs and other adjacent landowners for recreational purposes—a fact diminished by recent developments more particularly described within this complaint.

55.     Variously, Plaintiffs used the Toms Branch watershed as grounds for hunting, fishing, and swimming, and they are all concerned with potential broader environmental impact caused by Copart's acts and omissions.

**Copart's NPDES Permitting – Construction**

56.     Up until March 17, 2016, Copart never sought or received any NPDES permits for its land disturbance activities at its facilities in Lexington County, South Carolina.

57.     Nevertheless, over the course of 2012 and 2013, Copart disturbed approximately 38 acres of land in Copart Operations Area 1.

58.     Copart regularly stores and utilizes heavy earth-moving equipment on its facilities, almost continuously disturbing the soil on the property.

59.     Copart owns approximately 80 acres of undeveloped land adjacent to Copart

Operations Area #1.

60.    On March 17, 2016, Copart filed a "Notice of Intent" (NOI) for coverage under South Carolina's "NPDES General Permit for Stormwater Discharges from Construction Activities SCR 100000." Its application was approved on May 12, 2016. The title of the "Project/Site Plan" listed on this NOI was "Stormwater Management Improvements Copart Gaston Yard." The total disturbed area was listed as "4.3" acres.

61.    Copart identified Toms Branch as being affected by Copart's stormwater in its Notice of Intent for Coverage under the NPDES General Permit for Construction in 2016.

62.    Copart violated the CWA and state law by failing to apply for and receive a permit for Construction Activities before beginning land-clearing activities.

63.    Copart violated the CWA after obtaining Permit coverage by disturbing an area substantially in excess of 4.3 acres and continues to disturb far more area than 4.3 acres of land to this day.

**Copart's Historical and Ongoing Damage to the Environment**

64.    As a result of Copart's ongoing (and recently expanded) business operations at their facilities near Gaston, South Carolina, Plaintiffs have and are presently directly suffering damage to their interests.

65.    Since at least January 1, 2013, during any significant rainfall event, water, soil, sediment, metals, and hazardous materials and chemicals are washed from the Copart property into Toms Branch and ultimately through and onto the Plaintiffs' properties.

66.    The sediment, etc. that flows from Copart's property onto Plaintiffs' property has affected the Plaintiffs' properties.

67.    Besides the damage from sediment deposits on the properties that remain to this

10

day and the damage to the aesthetics of Plaintiffs' properties in the form of cloudy water for several days after each significant rain event, the chemical, metal, and sediment-laden water that flows from Copart's property negatively impacts the flora and fauna in and around streams and ponds on Plaintiffs' properties.

68.     In addition to the obvious impact of the runoff material from Copart's property visible to the naked eye, scientific testing conducted on a variety of samples from points on the periphery of Copart's property and within the Tom Creek's watershed, reveal significant amounts of sediment, high turbidity, and alarming levels of heavy-metals and other dangerous elements.

69.     These samples, taken during both dry and rainfall conditions, and from a variety of both wet and dry points in the downstream area, show, inter alia, various concentrations, in excess of allowable, safe limits, of:

- Sediment;
- Kaolin;
- Oil, grease, car fluids (transmission fluid, etc.);
- Dioctylphthalate;
- Aluminum;
- Iron
- Lead;
- Zinc;
- Copper;
- Arsenic;
- Barium;
- Calcium;
- Chromium;
- Magnesium;
- Nickel;
- Manganese;
- Potassium;
- Vanadium;
- Sodium;
- Mercury;
- Tin;
- Cadmium; and

11

- Titanium.[2]

70.     These are the same elements found within various components of motor vehicles, such as batteries, radiators and fuel.

71.     Samples taken from "control areas," close, but not downstream of the Copart property, do not show similar levels of these elements. Numerous scientific studies have demonstrated that these elements, at significant quantities, can have a deleterious, or even fatal, effect on the environment and humans, plants, animals, and other organisms.

72.     As more particularly described below, the unpermitted, noncompliant, and uncontrolled manner that these Pollutants have been systematically released as a result of Copart's industrial activities violates the CWA.

**FOR A FIRST CAUSE OF ACTION**
**(Violation of the Clean Water Act, 33 USC §1365(a)(1)—Unpermitted Land Disturbance)**

73.     Every prior allegation is incorporated as if set forth verbatim.

74.     By its acts and omissions, from 2006 until 2016, Copart engaged in the unpermitted land disturbance activities of destroying vegetation, clearing, and excavating over 100 acres of its property—greatly expanding its existing operations at Copart Operations Area 1. These areas are presently full of salvage motor vehicles.

75.     By its activities in clearing land, this multi-national, multi-billion-dollar, out-of-state corporation, has repeatedly flaunted and continues to ignore the CWA's land-disturbance provisions, as implemented in the South Carolina Stormwater Management and Sediment Reduction Act. S.C. Code 48-14-10 et. seq., S.C. Code of Regulations, 72-300 et. seq.

76.     Copart's repeated land disturbance actions, and its failure to become properly

---

[2] These materials are collectively referred to as "Pollutants."

permitted, over the course of almost a decade, resulted in the dramatic expansion of its unlawful business operations that continue to negatively impact Plaintiffs' interests.

77.     From at least January 1, 2013, until May 2016, Copart discharged kaolin-and-sediment-laced stormwater and Pollutants into Toms Branch from its outfall pipe at its lower detention pond without coverage under an NPDES permit.

78.     At least part of the discharged kaolin, sediment, and Pollutants remains in the Toms Branch creek bed and Plaintiffs' ponds, where it is capable of remediation and causing a continuing violation everyday hereafter because the damage is not wholly past until remediated.

79.     In other words, Copart has committed a CWA violation every day since January 1, 2013, and continues to do so because the unpermitted land clearance allowed sediment and other pollutants to enter Toms Branch and Plaintiffs' properties, with the discharged sediment remaining in Plaintiffs' ponds.

80.     Plaintiffs have suffered and will continue to suffer irreparable harm if Copart is not enjoined to take action to restrain its discharge of pollutants and prevent further damage to Plaintiffs' properties and to repair the existing damage so as to restore the properties to their former conditions.

81.     Accordingly, permanent injunctive relief to stop the violative discharges and remediate Plaintiffs' properties is appropriate in this case.

82.     In addition, Copart should pay penalties to the United States to the full extent and full amount possible for each day it has violated the CWA since at least January 1, 2013.

**FOR A SECOND CAUSE OF ACTION**
**(Violation of the Clean Water Act, 33 USC §1365(a)(1)—Non-Compliance Violations until April 2020)**

83.     Every prior allegation is incorporated as if set forth verbatim.

84.    Copart has continuously discharged stormwater laced with kaolin, sediment, and the various other pollutants set forth herein from point sources at Copart Operations Area 1 since 2013 and continues to do so to this day after each significant rain event.

85.    In 2016, Copart submitted a Notice of Intent for coverage under a construction general permit in which Copart identified 4.3 disturbed acres in May 2016.

86.    However, far more—roughly 78 acres—were disturbed by Copart before May 2016.

87.    In April 2020, Copart made a "major modification" and expanded the area subject to the permit coverage to 61 disturbed acres and identified "214 total acres."

88.    Both the federal regulations and similar state regulations make permit noncompliance a CWA violation. 40 C.F.R. § 122.41 ("Any permit noncompliance constitutes a violation of the Clean Water Act"); *see also* S.C. Code Regs. 61-9.122.41 (a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and the Pollution Control Act").

89.    The application for coverage under the Permit requires showing "[t]he location of the land disturbing activity shown on a USGS 7.5 minute topographic map or copy," S.C. Reg. 72-307(A)(3)(a), with "land disturbing activity" defined as "any use of the land by any person that results in a change in the natural cover or topography that may cause erosion and contribute to sediment and alter the quality and quantity of stormwater runoff." S.C. Reg. 72-301(23).

90.    Moreover, the Permit does not allow the discharges in this situation, and § 1.3.1(A) of the Permit provides:

> Subject to compliance with the terms and conditions of this permit, you are . . . authorized to discharge pollutants in Stormwater discharges from construction activities including clearing, grading, filling, demolition that results in soil exposure, excavating and other land disturbing activities of one acre or more. In addition, stormwater discharges from projects or developments of less than one acre of land disturbance are required to obtain authorization under this permit if the

14

construction activities at the site are part of a larger common plan of development or sale that comprise of at least one acre of land disturbance. *One or more site operators must maintain coverage under this permit for all portions of a site that have not reached final stabilization as defined in Appendix A.*

Moreover, the Permit incorporates requirements under S.C. Reg. 72-307(C)(5), which include:

(5) Water quality control is also an integral component of stormwater management. The following design criteria is established for water quality protection unless a waiver or variance is granted on a case-by-case basis.

….

(b) *Stormwater runoff and drain to a single outlet from land disturbing activities which disturb ten acres or more shall be controlled during the land disturbing activity by a sediment basin* where sufficient space and other factors allow these controls to be used until the final inspection. The sediment basin shall be designed and constructed to accommodate the anticipated sediment loading from the land-disturbing activity and meet a removal efficiency of 80 percent suspended solids or 0.5 ML/L peak settable solids concentration, whichever is less. The outfall device or system design shall take into account the total drainage area flowing through the disturbed area to be served by the basin.

91.     Accordingly, "land disturbing activities" must be disclosed on the Notice of Intent and all acres of land disturbing areas must be accounted for in the drainage area until they reach final stabilization (i.e., cover or revegetation).

92.     The stormwater discharged from Copart's outfall device or system violates SC Reg 72-307(c)(5)(b) because it contains an efficiency of less than 80% suspended solids and/or greater than 0.5 ML/L peak settleable solids concentration

93.     Here, Copart has disturbed 70+ acres beyond the 4.3 permitted acres and not undertaken any soil stabilization measures on that portion of the property—it remains completely bare dirt—and this all drains into the detention pond and ultimately through the outfall pipe at the lower detention pond.

94.     The Permit never protected Copart from May 2016 until April 2020 for discharges

at the site because Copart did not disclose the total area disturbed as required.

95.     Accordingly, from May 2016 until April 2020, any discharge from the lower detention pond into Toms Branch and then onto Plaintiffs' property was unpermitted because the Notice of Intent only obtained coverage under the Permit for the 4.3 acres while roughly 78 acres drained into and through the lower detention pond.

96.     These violations have continued each day since at least the first discharge after obtaining permit coverage because all or part of the sediment and Pollutants from each discharge remains in Plaintiffs' ponds, capable of remediation yet unpremeditated, and causing a continuing violation.

97.     Plaintiffs have suffered and will continue to suffer irreparable harm if Copart is not enjoined to take action to restrain its discharge of pollutants and prevent further damage to Plaintiffs' properties and to repair the existing damage so as to restore the properties to their former conditions.

98.     Accordingly, permanent injunctive relief to stop the violative discharges and remediate Plaintiffs' properties is appropriate in this case.

99.     In addition, Copart should pay penalties to the United States to the full extent and full amount possible for each day it has violated the CWA since at least January 1, 2013.

**FOR A THIRD CAUSE OF ACTION**
**(Violation of the Clean Water Act, 33 USC §1365(a)(1)—Non-Compliance Violations after April 2020)**

100.     Every prior allegation is incorporated as if set forth verbatim.

101.     Copart has continuously discharged stormwater laced with kaolin, sediment, and Pollutants into Toms Branch and onto Plaintiffs' properties from point sources at Copart Operations Area 1 since 2013 and continues to do so to this day after each significant rain event.

102.    In 2016, Copart submitted a Notice of Intent for coverage under a construction general permit in which Copart identified 4.3 disturbed acres in May 2016.

103.    However, far more—roughly 78 acres—were disturbed by Copart in May 2016.

104.    In April 2020, Copart made a "major modification" and expanded the area to 61 disturbed acres and identified "214 total acres."

105.    Both the federal regulations and similar state regulations make noncompliance a CWA violation. 40 C.F.R. § 122.41 ("Any permit noncompliance constitutes a violation of the Clean Water Act"); *see also* S.C. Code Regs. 61-9.122.41 (a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and the Pollution Control Act").

106.    The application for coverage under the Permit requires showing "[t]he location of the land disturbing activity shown on a USGS 7.5 minute topographic map or copy," S.C. Reg. 72-307(A)(3)(a), with "land disturbing activity" defined as "any use of the land by any person that results in a change in the natural cover or topography that may cause erosion and contribute to sediment and alter the quality and quantity of stormwater runoff." S.C. Reg. 72-301(23).

107.    Moreover, the Permit does not allow the discharges in this situation, and § 1.3.1(A) of the Permit provides:

> Subject to compliance with the terms and conditions of this permit, you are . . . authorized to discharge pollutants in Stormwater discharges from construction activities including clearing, grading, filling, demolition that results in soil exposure, excavating and other land disturbing activities of one acre or more. In addition, stormwater discharges from projects or developments of less than one acre of land disturbance are required to obtain authorization under this permit if the construction activities at the site are part of a larger common plan of development or sale that comprise of at least one acre of land disturbance. *One or more site operators must maintain coverage under this permit for all portions of a site that have not reached final stabilization as defined in Appendix A.*

108.    Furthermore, the Permit incorporates requirements under S.C. Reg. 72-307(C)(5), which include:

17

(5) Water quality control is also an integral component of stormwater management. The following design criteria is established for water quality protection unless a waiver or variance is granted on a case-by-case basis.

….

> (b) *Stormwater runoff and drain to a single outlet from land disturbing activities which disturb ten acres or more shall be controlled during the land disturbing activity by a sediment basin* where sufficient space and other factors allow these controls to be used until the final inspection. The sediment basin shall be designed and constructed to accommodate the anticipated sediment loading from the land-disturbing activity and meet a removal efficiency of 80 percent suspended solids or 0.5 ML/L peak settable solids concentration, whichever is less. The outfall device or system design shall take into account the total drainage area flowing through the disturbed area to be served by the basin.

109.    Copart violated these incorporated Permit provisions by discharging water from a total drainage area larger than what the Permit covered and where the discharged water routinely exceeded a removal efficiency of 80 percent suspended solids or 0.5 ML/L peak settable solids concentration.

110.    Accordingly, "land disturbing activities" must be disclosed on the Notice of Intent and all acres of land disturbing areas must be accounted for in the drainage area until they reach final stabilization (i.e., cover or revegetation).

111.    Here, Copart has disturbed 70+ acres beyond the 4.3 permitted acres and not undertaken any soil stabilization measures on that portion of the property—it remains completely bare dirt—and this all drains into the detention pond and ultimately through the outfall pipe at the lower detention pond.

112.    Since April 2020, Copart has not been protected by the Permit because the expanded 61 acres covered in the Amended Notice of Intent still does not account for the roughly 78 acres disturbed.

113.    Additionally, in January 2021, South Carolina issued a new General Permit for

Construction Activities ("2021 Permit). It contains the exact same Section 1.3.1(A) as the Permit and also incorporates the relevant regulations in S.C. Reg. 72-307.

114.    Accordingly, all Copart violations since April 2020 are discharges in violation of the CWA, the terms of the Permit and the 2021 Permit, and thus not covered.

115.    Any discharge from the lower detention pond into Toms Branch and then onto Plaintiffs' property was unpermitted because the Notice of Intent only obtained coverage under the Permit for the 4.3 acres while roughly 78 acres drained into and through the lower detention pond.

116.    These violations have continued each day since at least the first discharge after Copart obtained permit coverage because all or part of the sediment from each discharge remains in Plaintiffs' ponds, capable of remediation yet unpremeditated, and causing a continuing violation.

117.    Plaintiffs have suffered and will continue to suffer irreparable harm if Copart is not enjoined to take action to restrain its discharge of pollutants and prevent further damage to Plaintiffs' properties and to repair the existing damage so as to restore the properties to their former conditions.

118.    Accordingly, permanent injunctive relief to stop the violative discharges and remediate Plaintiffs' properties is appropriate in this case.

119.    In addition, Copart should pay penalties to the United States to the full extent and full amount possible for each day it has violated the CWA since at least January 1, 2013.

## FOR A FOURTH CAUSE OF ACTION
### (Violation of the Clean Water Act, 33 USC §1365(a)(1)—Permit Compliance Violations)

120.    Every prior allegation is incorporated as if set forth verbatim.

121.    Copart has continuously discharged stormwater laced with kaolin, sediment, and

Pollutants into Toms Branch and onto Plaintiffs' properties from point sources at Copart Operations Area 1 since 2013 and continues to do so to this day after each significant rain event.

122.    In 2016, Copart submitted a Notice of Intent for coverage under a construction general permit in which Copart identified 4.3 disturbed acres in May 2016.

123.    In 2021, South Carolina issued the 2021 Permit under which Copart now has coverage.

124.    Since 2016 and to the present day, Copart has discharged kaolin and Pollutant-laced stormwater into Toms Branch and onto Plaintiffs' properties from point sources at Copart Operations Area 1 in violation of certain other provisions of the Permit and the 2021 Permit:

   A.  **Section 3.2.6(A)(I)**

       1.  **Standard**:        Requiring, "Each erosion prevention BMP must be designed, installed and maintained to achieve maximum pollutant removal, *to the extent that the Permittee's discharges shall not cause or contribute to violations of water quality standards*, as outlined below and by the design criteria identified in State Regulation 72-307 - Specific Design Criteria, Minimum Standards and Specifications

       2.  **Violation**: Copart's discharge at the outfall pipe drastically impacts and violates water quality standards in Toms Brach.

   B.  **Section 3.2.6(A)(I)(a)**

       1.  **Standard**:        **Stabilization**. Except as provided below, initiate soil stabilization measures as soon as practicable whenever land-disturbing activities have been temporarily or permanently ceased, but in no case more than 14 days after land-disturbing activity in that portion of the construction site has temporarily or permanently ceased.

       2.  **Violation**: Copart has disturbed 70+ acres beyond the 4.3 permitted acres and not undertaken any soil stabilization measures on that portion of the property, which drains into the detention pond and ultimately through the outfall.

   C.  **Section 3.2.6(A)(II)**

       1.  **Standard**:        Each sediment control BMP must be designed, installed and maintained to achieve maximum pollutant removal, *to the extent that the permittee's discharges*

20

*shall not cause or contribute to violations of water quality standards*, as outlined below and by the design criteria identified in State Regulation 72-307(C)(5)(a), 72-307C(5)(b) and 72-307(C)(5)(c).

2. <u>**Violation**</u>: Copart's discharge at the outfall pipe drastically impacts and violates water quality standards in Toms Brach.

**D. Section 3.2.6(A)(II)(c)**

1. <u>**Standard**</u>:        Sediment Basins. For common drainage outfalls that serve an area with 10 or more disturbed acres, a sediment basin, or equivalent sediment control BMPs, which meets the criteria identified in State Regulations 72-307(C)(5), must be provided where attainable until final stabilization of the construction site is achieved.

   ▪ S.C. Code Ann. Regs. 72-307(C)(5) provides in part, "The outfall device or system design shall take into account the total drainage area flowing through the disturbed area to be served by the basin."

2. <u>**Violation**</u>: Copart has disturbed 70+ acres beyond the permitted 4.3 acres without accounting for the acreage beyond the permitted area that drains through the detention pond and through the Copart outlet.

**E. Section 3.2.6(A)(II)(e)**

1. <u>**Standard**</u>:        **Water Surface Dewatering.** When discharging from sediment basins and similar impoundments, *utilize outlet structures that only withdraw water from near the surface of the basin or impoundment*, unless infeasible. This outlet structure should be capable of conveying the flow for the 10-year, 24hr. storm event.

2. <u>**Violation**</u>: Copart has failed to maintain the outlet structure in the lower pond that release into the outfall pipe such that the outlet structure allows water well-below the surface to be released.

**F. Section 3.2.6(A)(III)**

1. <u>**Standard**</u>:        Runoff Control and Conveyance Measures BMPs. Each runoff control and conveyance measure BMP must be designed, installed and maintained to achieve maximum pollutant removal, *to the extent that the permittee's discharges that shall not cause or contribute to violations of water quality standards*, as outlined below and by the design criteria identified in State Regulation 72-307 - Specific Design Criteria, Minimum Standards and Specifications, unless specifically exempted by SC Regulation 72-302A.

2. **Violation**: Copart's discharge at the outfall pipe drastically impacts and violates water quality standards in Toms Brach.

G. **Section 3.2.6(A)(IV)**

1. **Standard**:        Post Construction Water Quality Control BMPs. Each post-construction water quality control BMP, including structural and non-structural BMPs, as mentioned below, must be designed, installed and maintained to achieve maximum pollutant removal, *to the extent that the permittee's discharges that shall not cause or contribute to violations of water quality standards*, as outlined below and by the design criteria identified in State Regulation 72-307C(5)(d), 72-307C(5)(e), 72-307C(5)(f), 72-307C(5)(g) and 72- 307C(11), as applicable, unless specifically exempted by SC Regulation 72-302A. Design Criteria may be modified for a specific project or type of project.

2. **Violation**: Copart's discharge at the outfall pipe drastically impacts and violates water quality standards in Toms Brach.

H. **Section 3.2.10(A)(III)(c)**

1. **Standard**:        Stabilize exposed areas as soon as practical to limit the duration of large areas of exposed soil.

2. **Violation**: Copart violated this provision of the permit by leaving 78+/- acres cleared for years without vegetation and draining into its detention pond, through the outfall, and into Toms Branch.

125.    Additionally, Copart violated Section 9.1 of the permit as follows:

**Standard**:    Section 9.1 incorporates the Standard Conditions at S.C. Regs § 122.41 into the permit, and Copart has violated the following Standard Conditions:

a. **S.C. Regs § 122.41(e)(1)**: Proper operation and maintenance. The permittee *shall at all times properly operate and maintain in good working order and operate as efficiently as possible all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit*. Proper operation and maintenance includes effective performance based on design facility removals, adequate funding, adequate operator staffing and training and also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities or similar systems which are installed by a permittee only when the

operation is necessary to achieve compliance with the conditions of the permit.

b. **Violation**: Copart has repeatedly failed to maintain its stormwater system and particularly in the lower pond. Discharges while in violation of this provision are violations of the permit. In fact, Copart regularly failed to construct and or/maintain the stormwater facilities it did construct on its site. Each day Copart was in violation or under a stop work order was a violation of its permit and a new violation of the CWA. Lexington County cited Copart repeatedly and issued Notices of Violation and Stop Work Orders through October 2020 as shown on the attachments to **Exhibit A**.

126. Each section identified in the preceding two paragraphs is also included in the 2021 Permit, the new NPDES General Construction Permit issued in January 2021, and Copart continues to violate those sections in the same way.

127. Copart discharged Pollutant-laden stormwater far more turbid than the allowed water quality standards for turbidity, which for Toms Branch and Plaintiffs' ponds are 50 NTUs (non-lake standard) and 25 NTUs (lake standard) (*see* S.C. Code Ann. Regs. 61-68), and in turn caused all or parts of Toms Branch and Plaintiffs' ponds to suffer turbidity levels far in excess of 50 NTUs and 25 NTUs at various times since at least January 1, 2013.

128. The Pollutants and their impact on Plaintiffs' properties and the water in Toms Branch are addressed in detail in Dr. Durbin's expert reports, which are attached to **Exhibit A** at exhibits E and F thereto.

129. Copart violated the standards in S.C. Code Ann. Regs. 72-307(C)(5) by releasing impounded stormwater that did not meet a removal efficiency of 80 percent suspended solids or 0.5 ML/L peak settleable solids concentration.

130. Any discharge from the lower detention pond into Toms Branch and then onto Plaintiffs' property was unpermitted because Copart discharged the Pollutants while not in compliance with requirements of the Permit and the 2021 Permit.

131.    These violations have continued each day since at least the first discharge after Copart first obtained permit coverage in 2016 because all or part of the sediment from each discharge remains in Plaintiffs' ponds, capable of remediation yet un-remediated, and causing a continuing violation.

132.    Plaintiffs have suffered and will continue to suffer irreparable harm if Copart is not enjoined to take action to restrain its discharge of Pollutants and prevent further damage to Plaintiffs' properties and to repair the existing damage so as to restore the properties to their former conditions.

133.    Accordingly, permanent injunctive relief to stop the violative discharges and remediate Plaintiffs' properties is appropriate in this case.

134.    In addition, Copart should pay penalties to the United States to the full extent and full amount possible for each day it has violated the CWA since at least January 1, 2013.

**FOR A FIFTH CAUSE OF ACTION**
**(Violation of the Clean Water Act, 33 USC §1365(a)(1)—Wrong Permit Violations)**

135.    Every prior allegation is incorporated as if set forth verbatim.

136.    Copart has continuously discharged stormwater laced with kaolin, sediment, and Pollutants into Toms Branch and onto Plaintiffs' properties from point sources at Copart Operations Area 1 since 2013 and continues to do so to this day after each significant rain event.

137.    In 2016, Copart submitted a Notice of Intent for coverage under a construction general permit in which Copart identified 4.3 disturbed acres in May 2016.

138.    In 2021, South Carolina issued the 2021 Permit under which Copart now has coverage.

139.    Copart should be classified as an "industrial" concern requiring it to comply with an NPDES permit.

140.    S.C. Code Regs. 61-9.122.26(b) and 40 CFR § 122.26(b) provide in part:

(14) **Storm water discharge associated with industrial activity** means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122. For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; refuse sites; sites used for the application or disposal of process waste waters (as defined at part 401 of this chapter); sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas; manufacturing buildings; storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water. For the purposes of this paragraph, material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product.
                                                ***
The following categories of facilities are considered to be engaging in "industrial activity" for purposes of paragraph (b)(14):

(vi) Facilities involved in the recycling of materials, including metal scrapyards, battery reclaimers, **salvage yards, and automobile junkyards**, including but limited to those classified as Standard Industrial Classification 5015 and 5093.[3]

---

[3] Defined as follows:

**5015 Motor Vehicle Parts, Used**

Establishments primarily engaged in the distribution at wholesale or retail of used motor vehicle parts. This industry includes establishments primarily engaged in dismantling motor vehicles for the purpose of selling parts. Establishments primarily engaged in dismantling motor vehicles for scrap are classified in Industry 5093.

**5093 Scrap and Waste Materials**

Establishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials. This industry includes auto wreckers engaged in dismantling automobiles for scrap. However, those engaged in dismantling cars for the purpose of selling secondhand parts are classified in Industry 5015.

\*\*\*

(x) **Construction activity including clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area**. Construction activity also includes the disturbance of less than five acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more[.]

(Emphasis added).

141.    Copart is aware it should be classified as industrial because its nearly identical facilities in other states are covered by NPDES Industrial Permits.

142.    Copart's incorrect coverage under the Permit and the 2021 Permit for five years is ineffective, when proper permitting coverage should have been and should be under the NPDES General Industrial Permit ("Industrial Permit").

143.    Accordingly, all discharges of sediment-laden and Pollutant-laden stormwater by Copart into Toms Branch and onto Plaintiffs' properties are violations unshielded by the Permit and the 2021 Permit.

144.    Plaintiffs have suffered and will continue to suffer irreparable harm if Copart is not enjoined to take action to restrain its discharge of Pollutants and prevent further damage to Plaintiffs' properties and to repair the existing damage so as to restore the properties to their former conditions.

145.    Accordingly, permanent injunctive relief to stop the violative discharges and remediate Plaintiffs' properties is appropriate in this case.

146.    In addition, Copart should pay penalties to the United States to the full extent and full amount possible for each day it has violated the CWA since at least January 1, 2013.

## FOR A SIXTH CAUSE OF ACTION
### (Negligence)

147.    Every prior allegation is incorporated as if set forth verbatim.

26

148.     Copart owes Plaintiffs each a duty not to permit Copart's land to remain in an altered state if such altered state creates a condition the natural and foreseeable result of which will result in injury to the Plaintiffs' property

149.     Here, Copart's duty requires it to prevent stormwater discharge from its property laden with Pollutants from harming Toms Branch and Plaintiffs' properties.

150.     Copart breached this duty and continues to do so by discharging and failing to prevent the discharge of stormwater laden with Pollutants onto Plaintiffs' properties and failing to manage, mitigate or otherwise control its polluting activities.

151.     Copart knew or should have known that its acts and omissions were virtually certain to cause stormwater laden with Pollutants to be discharged into Toms Branch and onto Plaintiffs' properties, thereby harming to Plaintiffs.

152.     Copart's acts and omissions actually resulted in harm to Plaintiffs and their properties, Toms Branch, and the environment.

153.     Copart has been on notice of the harm it has caused Plaintiffs yet has failed and refused to cease its discharge of polluted stormwater.

154.     Despite Copart's actual or constructive knowledge of the harm it was causing to Plaintiffs, it has failed to abate the harm it is causing, even failing to take reasonable steps for years after being made aware of the damage it has caused and continues to cause to the Plaintiffs' property.

155.     As a direct and proximate result of Copart's acts and omissions, and as a direct and proximate result of Copart's negligence, gross negligence, recklessness, and willful and wanton behavior, Plaintiffs have suffered damages.

156.     Copart has acted willfully, wantonly, and in reckless disregard for Plaintiffs' rights in its failure to properly manage stormwater and Pollutants on its property and continues to act in callous disregard to Plaintiffs' rights and property interests, entitling Plaintiffs to recover actual damages and punitive damages from Copart.

## FOR AN SEVENTH CAUSE OF ACTION
### (Nuisance)

157.     Every allegation is incorporated as if set forth verbatim.

158.     Copart's improper control of stormwater discharge from its property laden with Pollutants resulting in the harms described above, constitutes a substantial and unreasonable interference with Plaintiffs' use and enjoyment of their properties.

159.     Copart knew or should have known of the existence of this nuisance but have taken no steps to abate the harms suffered by Plaintiffs.

160.     Plaintiffs have suffered damages as the proximate result of Copart's improper management of hazardous materials and stormwater discharges.

161.     Copart's activities constitute a past, present and ongoing nuisance, and Plaintiffs are entitled to recover actual damages as a result of Copart's nuisance.

162.     Plaintiffs are further entitled to injunctive relief and punitive damages as a result of Copart's past, present and continuing willful, wanton and reckless disregard for the rights of the Plaintiffs.

## FOR AN EIGHTH CAUSE OF ACTION
### (Trespass and Continuing Trespass)

163.     Every allegation hereinabove is incorporated as if set forth verbatim.

164.     Plaintiffs are in legal possession of their properties.

28

165.    Copart has made a voluntary entry or caused harmful material to enter and flow onto Plaintiffs' properties by permitting its own improperly controlled stormwater laden with Pollutants to be discharged onto Plaintiffs' properties.

166.    This entry was without Plaintiffs' permission. Copart's actions constitute a trespass and continuing trespass by encroachment of water, sediment, and other matter onto Plaintiffs' property.

167.    Copart knew or should have known that its activities in failing to properly manage their industrial and land disturbance activities in close proximity to Plaintiffs' property would, to a substantial certainty, result in the discharge of stormwater laden with soil, sediment, and Pollutants onto the property of Plaintiffs.

168.    Copart has known of the existence of these trespasses but has taken no effective steps to abate the flow of stormwater laden with soil, sediment, and Pollutants onto Plaintiffs' properties during and after any major rainfall event.

169.    Copart has acted and continues to act willfully, wantonly, and in reckless disregard for Plaintiffs' rights in discharging improperly controlled stormwater, laden with Pollutants onto Plaintiffs' properties entitling Plaintiffs to the recovery of their actual damages and punitive damages from Copart.

WHEREFORE, having complained of Copart, Plaintiffs pray the Court enter judgment awarding them all available and appropriate relief, including:

a) Fines and penalties, for past, current, and continuous violations of the CWA, payable to the United States Treasury;

b) Injunctive relief to prevent recurrence of Copart's harmful acts;

c) Actual damages, including incidental and consequential damages, in an amount to be determined by a jury;

d) Punitive damages in an amount to be determined by a jury;

e) Attorneys' fees, costs, and litigation expenses; and,

f) Such other and further relief as the court may deem just and proper.


Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

s/ *Richard C. Detwiler*
Richard C. Detwiler, Fed. Bar. No. 510
Ian T. Duggan, Fed. Bar. No. 12670
Harry A. Dixon, Fed. Bar. No. 12870
Matthew L. Jepertinger, Fed. Bar. No. 13203
P.O. Box 1390
1812 Lincoln Street, Second Floor (29201)
Columbia, South Carolina 29202
Ph: 803-404-6900
Fax: 803-404-6902
rickdetwiler@callisontighe.com
ianduggan@callisontighe.com
harrydixon@callisontighe.com
mattjepertinger@callisontighe.com

**ATTORNEYS FOR PLAINTIFFS**

October 8, 2021
Columbia, South Carolina